In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00080-CR


______________________________




ALLEN WAYNE HENDERSON, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 354th Judicial District Court


Hunt County, Texas


Trial Court No. 23,797




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Chief Justice Morriss



MEMORANDUM OPINION



 The two opposing sets of witnesses in the sexual assault trial of Allen Wayne Henderson
agreed on little. The few areas of agreement are that Henderson and his former girlfriend, Jean Ann
Oxford, had a stormy relationship, that Henderson visited Oxford in her home before dawn on
December 5, 2005, that during that visit at least Oxford's voice was raised, and that in the aftermath
of that event both Henderson and Oxford had minor injuries. Oxford accused Henderson of sexually
assaulting her that morning. Henderson's defense described Oxford as a spurned woman lying to
exact her revenge.

 In a bench trial, Henderson was convicted and sentenced to thirty years' imprisonment. (1) On
appeal, Henderson argues only that the evidence is factually insufficient to support the verdict. We
affirm the trial court's judgment because the evidence is factually sufficient.

 In a factual sufficiency review, we review all the evidence, but do so in a neutral light and
determine whether the evidence supporting the verdict is so weak or is so outweighed by the great
weight and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly
unjust. Roberts v. State, 220 S.W.3d 521, 524 (Tex. Crim. App. 2007); Marshall v. State, 210
S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim.
App. 2006); Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In making that review,
we are to afford "due deference" to a jury's determinations. Marshall, 210 S.W.3d at 625. 
"Although an appellate court reviewing factual sufficiency has the ability to second-guess the jury
to a limited degree, the review should still be deferential, with a high level of skepticism about the
jury's verdict required before a reversal can occur." Roberts, 220 S.W.3d at 524.

 Oxford testified that she and Henderson had been in an intimate relationship which ended
when they broke up the evening before this pre-dawn assault. She testified that Henderson woke her 
at 5:30 a.m., knocking on the door of her house and pushing past her when she answered the door. 
Oxford's narrative included Henderson barring her six-year-old son in the son's bedroom, hitting
Oxford, stripping her naked, and forcing her to perform oral sex on him. After Henderson left,
Oxford immediately took her son to her babysitter's house and called the police from that safe
location to explain what had happened. She went to the police station a few hours later. A number
of photographs were introduced, including a number of pictures of bruising, and damage to her home
that she claimed was caused during the course of the assault. She also testified that some of the
injuries  depicted  in  the  photographs  resulted  from  a  fight  with  Henderson  the  evening  of
December 4.

 Henderson's version of events differed considerably. He testified that he went, with his new
girlfriend in the car, to Oxford's house to collect his belongings. He testified that, even though he
and Oxford had broken up the night before, Oxford started "freaking out," yelling, screaming, and
even biting him when he said he wanted all his clothes. He testified that, defending himself, he
pulled her hair to get her away, and then took his bag out to the car. Henderson testified that he
returned to get bed sheets that were there to be washed. He testified that he was too exhausted to
have had sex with her that morning. Henderson could not otherwise account for Oxford's injuries.

 Sarah McClintic, Henderson's new girlfriend, testified about Henderson's vacillation between
the two women, about the breakup between Henderson and Oxford, and testified that she heard
Oxford's raised voice from inside the house from the enclosed car where McClintic waited. She also
testified that Henderson was inside the house only for two brief periods of about five minutes
each--brief enough to seriously dispute Oxford's version of events.

 Jamie Lynn Fagg, a friend of both Oxford ("best friends") and Henderson, testified that, after
getting off work, she joined her ex-husband and Henderson around 2:30 a.m., December 5, fishing
where Fagg lived. She testified that, after fishing with Fagg and her ex-husband for awhile but still
before dawn, Henderson left. Later that morning, Henderson returned and entered Fagg's house,
appearing upset, looking out the windows, saying he thought the cops were looking for him, and
recounting that Oxford had threatened to call the law on him if he ever laid a hand on her again. 
Fagg testified that Henderson did not answer when she asked him what he had done to Oxford that
morning.

 Peggy Jones, Oxford's babysitter of many years, testified that Oxford appeared with her son
at Jones' house around dawn December 5 showing extreme signs of emotional turmoil. Jones
described Oxford as "very, very upset," wringing her hands, complaining that she hurt all over, and
rubbing her hands over her body. Jones testified that she had never seen Oxford that upset in the
years she had provided child care for her son. She added that Oxford called the police using Jones'
telephone.

 Preston Boles testified that Henderson was working for or with him as a roofing contractor
during 2005, and that he normally met Henderson and other workers at 7:00 a.m. at a convenience
store to prepare for work; if they were not there at that time, they did not work. Counsel introduced
several paychecks from Boles to Henderson, which from their amounts indicated that he had worked
every day during that time period, because Boles paid workers by the day. Boles did not
independently remember the morning of December 5, but assumed from the paycheck amounts that
Henderson was there and worked that day.

 As there is substantial evidence from Oxford about the attack, Henderson is in the position
of arguing to this Court that the evidence supporting the verdict is so outweighed by the great weight
and preponderance of the evidence that the jury's verdict is clearly wrong or manifestly unjust. His
argument fails.

 We are confronted with a conflict in the evidence, something which must be resolved by the
fact-finder. In resolving evidentiary conflicts--the fact-finder's exclusive province--the fact-finder
is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. 
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). The fact-finder may choose to
believe some testimony and disbelieve other testimony. Id.

 The evidence is factually sufficient to support the verdict, and the evidence to the contrary
is not so compelling as to allow us to reach a contrary result. We overrule Henderson's sole point
of error.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: November 30, 2007

Date Decided: December 13, 2007


Do Not Publish
1. Henderson has a number of prior convictions for a variety of offenses.



tion to support the trial court's dismissal of that
claim.